IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

DONATUS I. AMARAM,

                                        Plaintiff,

        v.

VIRGINIA STATE UNIVERSITY,                    Civil Action No.: 3:06–CV–444
and DR. W. ERIC THOMAS,
in his Official Capacity as Provost,

                                        Defendants.

## MEMORANDUM OPINION

        THIS MATTER comes before the Court on Defendants VIRGINIA STATE

UNIVERSITY and DR. W. ERIC THOMAS's Motion for Summary Judgment pursuant to Fed.

R. Civ. P. 56. On June 26, 2006, Plaintiff DONATUS AMARAM instituted this action against

Virginia State University ("VSU" or "the University") and Dr. Thomas alleging several causes of

action that arise from the provost's decision to refrain from re-appointing the Plaintiff to a

position as the chairman of a department in the University's business school. For the reasons

stated herein, the Defendants' Motion shall be GRANTED, and this civil action shall be

DISMISSED.

## I.

        Dr. Donatus I. Amaram was hired as a faculty professor in VSU's School of Business on

August 1, 1984, and has taught continuously at the University since. Dr. Amaram has twice

served as department chair. His first chairmanship spanned from August 1, 1984, to June 30,

1993. His second chairmanship began on August 15, 2003, and was terminated by the University

on June 24, 2004. The circumstances surrounding Dr. Amaram's second appointment and his termination are at issue in this matter.

On June 25, 2003, Dr. W. Eric Thomas became the University's Provost and Vice President for Academic Affairs. The provost is the education official responsible for the quality of the academic operations of the University and routinely makes decisions regarding the selection, retention, and termination of faculty appointments. Approximately one month after becoming provost, Dr. Thomas appointed Dr. David Bejou to serve as the Acting Dean of the School of Business. In that capacity Dean Bejou would be responsible for overseeing the financial integrity of the Business School's operations, as well as the processes of selecting, retaining, and promoting professors. Dean Bejou was accountable to Provost Thomas, who in turn answered directly to the President of the University.

Soon after Dr. Thomas became provost, the chairmanship of the Department of Management and Marketing became available. This department is an academic subdivision of the School of Business. As Acting Dean of the business school, Dr. Bejou recommended the Plaintiff for the chairmanship. On August 12, 2003, Provost Thomas acted on the recommendation and appointed Dr. Amaram to serve as the department chair. The Faculty Handbook explains that a department chair ordinarily serves for a term of three years, with the option of being renewed for a second three-year term. However, there is evidence that department chairs generally serve at the pleasure and discretion of the provost. Dr. Amaram's contract, dated August 22, 2003, designates him as "Professor, Department of Management and Marketing / Chairperson" and states that his appointment would expire on June 24, 2004. As the chairman, Dr. Amaram bore the overall responsibility for the department's quality of instruction and curriculum.

2

At the time of Dr. Amaram's appointment, the business school was attempting to secure accreditation from the Association to Advance Collegiate Schools of Business ("the AACSB"). The AACSB is a not-for-profit convention of educational institutions and corporations dedicated to promoting and improving higher education in business administration and management. Pursuant to the terms of a settlement agreement between the Commonwealth of Virginia and the federal government, the University's business school was obliged to attain accreditation from the AACSB. Although VSU's business program has since obtained AACSB accreditation, at the time that the events relevant to this matter occurred, accreditation remained the final obstacle in satisfying the above-referenced settlement agreement. The accreditation initiative involved each department in the business school and was known to its faculty, including Dr. Amaram.

That same August, Drs. Thomas and Bejou met with representatives from the Commonwealth, the federal government, and the AACSB to discuss the business school's progress toward accreditation. The AACSB stated that it would allow the University to seek accreditation under the "old standards" in place when VSU's accreditation petition was initially filed, rather than the revised, and more stringent, standards that had been recently enacted. In consideration of the AACSB's generous offer, Drs. Thomas and Bejou committed the business school to achieving accreditation by December 2006.

The AACSB advised the University that the greatest obstacle remaining to its accreditation was the academic and professional qualifications of its faculty. To become academically qualified, a professor must earn a terminal degree; to maintain that status, the professor must perform research and have that research published at a professional conference or in a peer-reviewed scholarly journal.

3

During the fall of 2003, a number of mandatory meetings were organized by the University's administration to apprise the faculty of the business school's legal obligation to become accredited and of what was consequently required of the faculty members. In no uncertain terms, the faculty was informed that accreditation hinged on the production of scholarly research and publications.

In October 2003, the faculty of the business school adopted a new evaluation policy that tied a professor's performance rating to the professional and academic standards established by the AACSB. In short, if a faculty member's professional or academic qualifications were found to be insufficient pursuant to the AACSB's standards, then that professor would automatically receive an unsatisfactory annual evaluation. In November 2003, the University's Board of Visitors approved for the business school a similar post-tenure review policy.

After a period of discussion and review, some members of the business school's faculty were found to be either academically or professionally unqualified. One of those professors was Dr. Sikiru Olusoga, a member of the faculty of Dr. Amaram's Department of Management and Marketing. Dr. Olusoga was informed that he was underqualified according to AACSB standards, that he was expected to produce more peer-reviewed scholarship, and that he was expected to draft, submit, and adhere to a Performance Development Plan to guide his effort toward attaining "qualified" status. Dr. Olusoga was also placed on post-tenure review.

In March 2004, Dean Bejou assessed the progress of each business school faculty member placed on post-tenure review. It was his opinion that Dr. Olusoga's plans to publish his scholarship "sounded vague and general," and that Dr. Olusoga would need "at least two or three

journal articles and from five to seven conference papers by the end of [that] academic year to be deemed Academically Qualified."

At about the same time, Dr. Amaram also conducted an evaluation of Dr. Olusoga's progress toward AACSB qualification. It was noted that Dr. Olusoga had made only one effort to present a paper at a professional conference. Despite this, and contrary to Dean Bejou's assessment, Dr. Amaram concluded that Dr. Olusoga's performance was satisfactory. This was not the first time since the implementation of the post-tenure review process that Dr. Amaram had rated Dr. Olusoga favorably.

Based on the performance review conducted by Dean Bejou, Provost Thomas terminated Dr. Olusoga's faculty appointment at the University. It was the provost's opinion that Dr. Olusoga had failed to demonstrate a good faith effort toward improving his academic qualifications, and that this merited his removal from the faculty.

Provost Thomas also concluded that Dr. Amaram was negligent in the performance of his responsibilities as department chair for his apparent refusal to implement the post-tenure review policy effectively. Consequently, upon the expiration of his one-year term on June 24, 2004, Dr. Amaram was not reappointed to the chairmanship of the Department of Management and Marketing, though he does continue to serve as a member of the faculty.

## II.

The Plaintiff has filed this action as a consequence of his failure to be reappointed to his chairmanship following the expiration of his one-year term. It is alleged that the provost's failure to reappoint the Plaintiff amounts to a breach of contract under state law, is a denial of civil rights pursuant to Title 42, United States Code § 1983, and is the consequence of direct and

indirect discrimination on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964, as codified at Title 42, United States Code § 2000e.

The Defendants have moved for summary judgment with respect to each of these three causes of action. The familiar standard of review is set forth at Federal Rule of Civil Procedure 56(c), which provides that summary judgment is appropriate if it appears from the record "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Court has considered the facts of this matter as they have been presented by the parties, has drawn inferences from those facts in the light more favorable to the non-moving party, and has come to the conclusion that the material facts of this matter are not in dispute. The only inquiry remaining is whether the Defendants are entitled to judgment as a matter of law.

## III.

### A.    Breach of Contract

It is Dr. Amaram's contention that his employment contract with the University was breached when Provost Thomas declined to reappoint the Plaintiff to reprise his role as department chair. Two reasons render this allegation fatally defective.

Virginia State University is a constituent entity of the Commonwealth of Virginia. See Richard Anderson Photography v. Radford Univ., 633 F. Supp. 1154, 1158 (W.D. Va. 1986). And as an agent of the Commonwealth, claims of this type are strictly prohibited by the United States Constitution. It is stated by the Eleventh Amendment that "[t]he Judicial powers of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." The unstated corollary

6

to the Eleventh Amendment is that federal courts must refrain from exercising jurisdiction over suits commenced by the citizen of a state brought against the state of the citizen's domicile. See, e.g., Hans v. Louisiana, 134 U.S. 1 (1890). Together, these principles preserve the integrity of state sovereign immunity within our federal structure and establish the proposition that federal courts will not countenance those actions in the exercise of their diversity or supplemental jurisdiction which would otherwise be prohibited by the courts of the forum state on the basis of that state's sovereign immunity.

It should be noted that sovereign immunity does not prohibit all suits against a state. The Fourteenth Amendment to the United States Constitution provides a mechanism through which Congress may abrogate a state's immunity, and of course states themselves may waive their immunity or consent to a suit which would otherwise be prohibited. In the matter currently before the Court for consideration, the breach of contract allegation is a claim for relief that arises under state law. Accordingly, if the Plaintiff is to sue the Commonwealth on a state law cause of action, it is his burden to demonstrate that the state has waived its immunity or consented to this suit. That burden has not been carried.

The Plaintiff submits that the Commonwealth's sovereign immunity has been waived by the General Assembly through Virginia Code § 2.2-814. While it is true that this provision represents a limited waiver of sovereign immunity, more importantly, § 2.2-814 and the sections that follow describe the procedure that those having a pecuniary claim against the Commonwealth must observe in order to obtain the compensation they seek. Limited waivers of immunity are strictly construed in favor of the sovereign, and to be effective as against the sovereign must be strictly observed. See, e.g., Lane v. Pena, 518 U.S. 187 (1996); Sabre Constr.

7

Corp. v. County of Fairfax, 501 S.E.2d 144 (Va. 1998). There is no indication that Dr. Amaram has complied with the procedure set forth by Virginia Code § 2.2-814 with respect to his breach of contract claim. As a consequence, the Commonwealth's sovereign immunity has not been waived with respect to this particular cause of action, and therefore dismissal on the basis of lack of subject matter jurisdiction is proper. Cf. Katti v. Moore, 2006 WL 342253 (E.D. Va. November 22, 2006) (Payne, J.) (dismissing a breach of contract action against VSU on the basis of the plaintiff's failure to abide by the limited waiver procedure set forth in § 2.2-814).

Even if the Plaintiff had sufficiently complied with the limited waiver procedure, this breach of contract claim would still be subject to dismissal on the basis of the Eleventh Amendment. "A State does not waive its Eleventh Amendment immunity by consenting to suit only in its own courts." Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 306 (1990) (citing Florida Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n, 450 U.S. 147, 150 (1981)). "[I]n order for a state statute or constitutional provision to constitute a waiver of Eleventh Amendment immunity, it must specify the State's intention to subject itself to suit in federal court." Atascandero State Hosp. v. Scanlon, 473 U.S. 234, 239–40 (1985) (emphasis in original). "The Court will give effect to a State's waiver of Eleventh Amendment immunity only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." Feeney, 495 U.S. at 305 (internal quotations and citations omitted). Dr. Amaram has not suggested, and this Court is not aware of, any expression, statutory or otherwise, of the Commonwealth's acquiescence to federal jurisdiction. Cf. McConnell v. Adams, 829 F.2d 1319, 1328–29 (4th Cir. 1987) (holding that the Virginia Tort Claims Act has not waived the Commonwealth's Eleventh Amendment immunity,

8

despite constituting a waiver of the state's sovereign immunity in its own courts). For these reasons, the Eleventh Amendment prohibits this Court from exercising subject matter jurisdiction over the breach of contract claim.

The Eleventh Amendment aside, Dr. Amaram has also failed to support his allegations with the necessary factual predicate to survive summary judgment. The essence of a breach of contract claim is the existence of a valid and enforceable contract through which the complainant is vested with certain rights and expectations. There is only one contract whose existence has been alleged in this matter, and that is the contract describing Dr. Amaram's appointment as department chair for a term to expire on June 24, 2004. The Plaintiff contends that it was the "custom" or "tradition" of the provost to appoint department chairs to three-year terms, and that this historical context is capable of creating a contract, as well as sustaining an action for its breach.

The fact of the matter is that these expectations are normative, at best, and do not give rise to legal obligations. In consideration of legal obligations, however, the Plaintiff is obliged to support his breach of contract claim with credible evidence. There is no dispute that Dr. Amaram's appointment was to naturally expire on June 24, 2004, and that after this date, his contract to serve as department chair would lapse, unless he was reappointed. Very simply, an action for breach of contract will not lie where there is no contract.

For these reasons, the Defendants' Motion for Summary Judgment with respect to the breach of contract claim shall be GRANTED on the basis of the Eleventh Amendment to the United States Constitution, or alternatively, on the basis that judgment is proper in the Defendants' favor as a matter of law. Accordingly, this claim shall be DISMISSED.

**B.      42 U.S.C. § 1983**

Dr. Amaram has also stated a claim pursuant to Title 42, United States Code § 1983 against both the University and Provost Thomas, presumably for a denial of due process under the Fourteenth Amendment of the United States Constitution. Notably, the suit against Dr. Thomas has been brought in only his official capacity as provost. It is a matter of black letter law that a private individual cannot maintain a § 1983 suit against a state or a state agency in federal court on the basis of Eleventh Amendment immunity. Edelman v. Jordan, 415 U.S. 651 (1974); see also Quern v. Jordan, 440 U.S. 332 (1979). It is similarly well-established that the Eleventh Amendment prohibits a federal court from entertaining a § 1983 suit brought against a state officer in his official capacity, Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989), except to the extent that the plaintiff is seeking prospective injunctive relief. Ex parte Young, 209 U.S. 123 (1908). Accordingly, the University shall be DISMISSED from this cause of action. The remainder of the analysis will consider only whether Dr. Amaram is entitled to prospective injunctive relief pursuant to § 1983.

From the outset of the discussion it should be noted that the ordinary breach of a government contract is not actionable under § 1983. Coastland Corp. v. Currituck County, 734 F.2d 175 (4th Cir. 1984). The contract at issue must do more than create a mere legal expectancy; it must invest the complainant with a property interest capable of constitutional protection. Id. Property interests are derived from a reasonable sense of entitlement in the continuation of a contract, engendered by an independent source of rules or understandings regarding the contract's terms and conditions. See Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972). An

entitlement may be created by statutes or regulations, ordinances, or even express or implied contracts. Id.

The Plaintiff represents that he was entitled to the continuation of his chairmanship beyond the one-year period prescribed by the employment contract because it was customary for appointees to serve three-year terms. In fact, the Faculty Handbook states that department chairs are appointed to three-year terms of service.

The provost does not deny the truth or accuracy of these allegations. But it is his interpretation of the appointment policy that department chairs serve at the pleasure of the provost for a maximum term of three years, with the option of serving an additional consecutive three-year term. The minimum term that may be served is established by the chairman's employment contract, which is subject to renewal up to a total term of service of three years.

The difference between these positions is simple. According to Dr. Amaram, a department chair is appointed for a term of three years regardless of whether his job performance is satisfactory. The provost contends that a department chair's employment contract may be renewed up to a total term of service of three years, and that renewal of the contract is contingent on the department chair's performance. On balance, Provost Thomas's position is far more reasonable.

In addition to making practical sense, the provost's interpretation is supported by the employment contract at issue. That contract states plainly that the term of the Plaintiff's appointment would expire on June 24, 2004, which was roughly one year from the date of his appointment. It may be tradition for the provost to renew an appointee's contract up to the maximum term of service, but there does not appear to be a legal obligation to do so.

Accordingly, it is the judgment of the Court that the Plaintiff did not have a property interest in serving as department chair beyond June 24, 2004, and that there is no basis on which to predicate this § 1983 claim for denial of due process. Summary judgment shall therefore be GRANTED in favor of Provost Thomas.

**C.    Employment Discrimination**

Dr. Amaram has alleged two alternative bases for his claim of employment discrimination: that his reappointment as department chair was denied as a consequence of his race or his national origin, or that his reappointment was denied in retaliation for the Plaintiff's objection to what he perceived as the University's discrimination against Dr. Olusoga on the basis of his race or national origin. The propriety of granting summary judgment in a matter alleging unlawful employment discrimination is assessed with reference to the McDonnell Douglas burden-shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981); St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993). This analysis examines: (1) whether the plaintiff has stated a prima facie case of employment discrimination; (2) whether the employer can propound a legitimate, non-discriminatory justification for the adverse employment action taken against the plaintiff; and (3) whether the plaintiff can rebut the asserted legitimate, non-discriminatory justification with evidence that it is merely a pretext for unlawful discrimination. The viability of each of Dr. Amaram's theories of discrimination must be tested pursuant to McDonnell Douglas.

The first of the Plaintiff's allegations of discrimination is that he was not reappointed as department chair as a consequence of his race or his national origin. The threshold inquiry under McDonnell Douglas is whether the plaintiff has stated a prima facie case of employment

discrimination. In this case, Dr. Amaram's prima facie case consists of showing: (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; and (3) that he was performing his job at a level that met the University's legitimate expectations at the time of the adverse employment action. McDonnell Douglas, 411 U.S. at 802–03; see Baqir v. Principi, 434 F.3d 733, 742 (4th Cir. 2006). Dr. Amaram has identified himself as a Nigerian-born black male, and there is no dispute that his race and national origin place him squarely within the membership of classes that are subject to heightened protection. There is also no doubt that the Plaintiff has endured an adverse employment action. The inquiry is therefore whether Dr. Amaram was performing his job as department chair in a manner that met the University's legitimate expectations at the time that his reappointment was declined.

The Defendants claim that Dr. Amaram had failed to meet their legitimate expectations, and this Court is inclined to agree. The Faculty Handbook states that department chairs "serve[] in a dual role as both faculty member and administrator." As the circumstances of this matter prove, it will happen from time to time that the interests of the faculty and the administration will be in conflict, thrusting department chairs into the unenviable position of attempting to placate both colleagues and administrative officials. But the fact that his duty may be undesirable does not relieve the department chair of his obligation to implement the institution's academic policy, the crafting of which is the exclusive province of a university's administration. The department chair who disagrees with the institution's academic policy ultimately has two options; he may grudgingly enforce that policy, or he may quit his chairmanship. Should he attempt to forge a middle path, the department chair tempts the administration's disfavor and runs the risk of being involuntarily relieved of his post.

This is exactly what Dr. Amaram did. It is clear that Dr. Amaram was aware of the University's mission to acquire AACSB accreditation, that he knew his department's compliance with standards promulgated by the AACSB was essential to the University's acquisition of accreditation, and that he understood this academic policy had been set by the highest levels of the University's administration. In spite of all this, the record demonstrates that Dr. Amaram was failing to vigorously enforce the academic policy, even after learning that his administrative superiors were dissatisfied with his performance. At a minimum, the administrators of a university should be secure in their selection of department chairs that the men and women they have chosen to execute the academic policy of the institution will in fact execute their duty. The frustration of the administration's legitimate expectations leads inevitably to one consequence, an involuntary release from the responsibilities of department chair.

Dr. Amaram neglected as department chair to observe the University's academic policies. His failure to be reappointed was not the product of unlawful discrimination, but the foreseeable and reasonable consequence of his decision to ignore his administrative responsibilities. Accordingly, it is the judgment of this Court that the Plaintiff has failed to carry his burden of establishing a prima facie case that he was subjected to discrimination on the basis of his race or national origin.

For similar reasons, this Court also finds that the Plaintiff has failed to raise a presumption of unlawful retaliatory discrimination. To establish a prima facie case of retaliatory discrimination pursuant to McDonnell Douglas, a plaintiff must demonstrate: (1) that he reasonably perceived an action taken by his employer to be unlawful; (2) that he engaged in opposition to that employment action; (3) that he then personally endured an adverse

14

employment action; and (4) that a causal connection existed between the plaintiff's opposition

and the adverse employment action he consequently suffered. See, e.g., EEOC v. Navy Fed.

Credit Union, 424 F.3d 397, 405 (4th Cir. 2005). The fundamental inquiry of this analysis is

whether the complainant's perception that his employer has engaged in unlawful discrimination

is reasonable; for if that perception were not objectively reasonable, then the cause of action must

necessarily collapse.

      After reviewing the record, it is clear that Dr. Amaram's perception that the University

had engaged in unlawful discrimination with respect to Dr. Olusoga was not objectively

reasonable. First of all, there is an absolute lack of evidence in the record suggesting that the

Defendants even considered Dr. Olusoga's protected characteristics with respect to his discharge.

To the contrary, there is a significant amount of evidence that has been presented by the

Defendants that the University maintains a faculty that is populated by professors with

identifying characteristics almost identical with Dr. Olusoga's, and that many of these other

professors suffered no adverse employment actions.

      Second, the Defendants have propounded an independent and objective standard by

which Dr. Olusoga's qualifications were measured. The AACSB is a well-established

international organization whose membership consists of some of the finest educational

institutions in the world. The schools that have acquired accreditation from the AACSB retain

their status only by continuing to observe its standards, as opposed to standards that are issued by

each school independently. VSU was determined to attain accreditation; that objective could not

be achieved without a concerted effort on behalf of the University's administration and faculty

toward that end. Dr. Olusoga's qualifications were tested against the AACSB's standards and

found to be insufficient; he was placed on a probationary program that allowed him to attain the qualification necessary to retain his job; after several months and formal review, it was found that Dr. Olusoga had failed to make a sufficient effort to attain qualification and he was discharged. A reasonable person considering the cause of Dr. Olusoga's termination could arrive at only one conclusion, that it was the consequence of persisting in his insufficient qualifications. Accordingly, it is the judgment of this Court that the Plaintiff has failed to raise a presumption of retaliatory discrimination.

It is further the judgment of the Court that even if the Plaintiff had established a prima facie case of either direct or retaliatory discrimination, the claims would nonetheless be dismissed on summary judgment under the remaining elements of McDonnell Douglas. Once a prima facie case has been established, the defendant bears the burden of rebutting the inference of unlawful discrimination by demonstrating that there was a legitimate, non-discriminatory justification for the adverse employment action at issue. The University has carried this burden. Dr. Amaram was a department chairman, serving the University as part administrator, part faculty member. The University has made it clear that those serving as department chairs are instruments of the administration in effecting academic policy. Dr. Amaram neglected to implement the University's policies to the satisfaction of his supervising officials, and his negligence was not reasonable. The University consequently terminated his chairmanship, which was a legitimate and non-discriminatory response to the Plaintiff's failure to observe his administrative responsibilities.

The final analytical element of McDonnell Douglas assesses whether the plaintiff is capable of demonstrating that the defendant's legitimate, non-discriminatory justification is

16

nothing more than a pretext for unlawful discrimination. The record contains no evidence that the University's justification is pretextual. It is also noted that Provost Thomas appointed Dr. Amaram to serve as department chair, which weighs heavily against an inference that the University engaged in discrimination by declining to reappoint the Plaintiff.

Having tested the Plaintiff's allegations of discrimination against the McDonnell Douglas standard, it is the judgment of the Court that the Defendants' Motion for Summary Judgment with respect to these claims be GRANTED. The Plaintiff has failed to establish an inference of unlawful discrimination with respect to his failure to be reappointed; and even if he had, that inference would have been successfully rebutted by the legitimate, non-discriminatory justification articulated by the University.

## IV.

For the foregoing reasons, the Defendants' Motion for Summary Judgment shall be GRANTED in its entirety, and this case shall be DISMISSED.

An appropriate order shall issue.

                                    / s /  James R. Spencer
                            CHIEF UNITED STATES DISTRICT JUDGE


ENTERED this   20th   day of February 2007

17